Robert A. Spanner, Esq. (State Bar No. 60308)
TRIAL & TECHNOLOGY LAW GROUP
A Professional Corporation
545 Middlefield Road, Suite 220
Menlo Park, CA 94025
Telephone:     (650) 324-2223
Facsimile:     (650) 324-0178

Attorneys for Plaintiff
IP SOLUTIONS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IP SOLUTIONS, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>BANK OF AMERICA, N.A., a National Banking Association member; BANK OF AMERICA TECHNOLOGY AND OPERATIONS, INC., a Delaware corporation,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff IP Solutions, Inc. by and through its undersigned counsel, for its Complaint against Defendants Bank of America, N.A. and Bank of America Technology and Operations, Inc. states as follows.

## THE PARTIES

1.     Plaintiff IP Solutions, Inc. (hereinafter, "Plaintiff" or "IPS") is a Delaware corporation with its principal place of business in San Mateo County, California.

Complaint -

2.      Defendant Bank of America, N.A. ("BANA") is, on information and belief, a National Banking Association member organized and existing under the laws of the United States, with its principal place of business in Charlotte, North Carolina.  On information and belief, at all relevant times herein, BANA conducted business in San Francisco, California.

3.      Defendant Bank of America Technology and Operations, Inc. ("BATO") is, on information and belief, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.  On information and belief, at all times relevant herein BATO conducted business in San Francisco, California and provided services to BANA there.  (BANA and BATO will collectively be referred to as "Bank of America".)

## JURISDICTION AND VENUE

4.      This action arises under the Federal Copyright Act of 1976, as amended, 17 U.S.C. §101, *et seq.* (hereinafter referred to as the "Act").  Jurisdiction is founded on Sections 1331, 1338(a) and 1338(b) of the Judicial Code (28 U.S.C. §§ 1331, 1338(a) and 1338(b)).  This Court has supplemental jurisdiction over the contract claims asserted herein pursuant to 28 U.S.C. §1367 because these claims are closely related to the claim within the original jurisdiction of the Court, so that they form part of the same case or controversy.

5.      Venue is appropriate under 28 U.S.C. §1391(b)(2) and (c) and 1400(a).

## INTRADISTRICT ASSIGNMENT

6.      This is a copyright infringement case subject to District-wide assignment pursuant to Civ. L.R. 3-2(c) and the Court's General Order 44.

Complaint -

2

**OPERATIVE FACTS**

7.    Plaintiff is a company that, *inter alia*, develops project management courses which it offers to businesses. IPS also provides instruction to employees of a business so that the business can in turn provide project management courses to the business' own employees. IPS also develops and prepares the instructional materials for the project management courses.

8.    In or about 2001, IPS created two manuals for its project management courses – the Project Management Master – Instructor Guide and the Project Management Master – Participant Guide.

9.    IPS owns the copyrights and other intellectual property assets in the two manuals. The Project Management Master – Instructor Guide is a copyrighted work registered with the Copyright Office under U.S. Copyright Registration No. TXu-339-598 and the Project Management Master – Participant Guide is a copyrighted work registered with the Copyright Office under U.S. Copyright Registration No. TXu-339-597. (The Project Management Master – Instructor Guide and the Project Management Master – Participant Guide will collectively be referred to herein as the "PMM Materials".)

10.    On or about November 13, 2003, IPS and BATO entered into a contract ("Agreement") for project management instruction. A copy of the Agreement is attached hereto as Exhibit 1.

11.    On or about March 8, 2005, IPS and BANA entered into an Agreement Addendum ("Addendum"), a copy of which is attached as Exhibit 2 hereto, by which BANA, with IPS' consent, assumed the obligations of BATO under the Agreement.

Complaint -

3

12.    On or about March 8, 2005 IPS and BANA also entered into a second Agreement Addendum ("Second Addendum"), which incorporated the terms of the original Agreement. The Second Addendum also incorporated in an attachment a new agreement (Statement of Work ("SOW") #3) for the provision of services by IPS to BANA. A copy of the Second Addendum and SOW #3 is attached hereto as Exhibit 3. Pursuant to SOW #3, IPS agreed to provide to Bank of America, *inter alia*, development and customization of course materials ("PMM Materials") including a Participant Guide and an Instructor Guide for project management training.

13.    SOW#3 also specified, under "Rights to PMM Intellectual Property", that all materials were to be produced and shipped solely by IPS, and that IPS was to be paid $450 for the materials to be provided to each participant.

14.    In or about May, 2005 Bank of America began conducting PMM courses for its own employees at various locations throughout the United States, including, on information and belief, the Bank of America Building in San Francisco. These courses were conducted by infringing IPS's copyrights through the copying of PMM course materials, which were then distributed to the aforementioned employees of the Bank of America, in violation of the aforementioned contractual agreements and through infringement of IPS' copyrights in the PMM materials. Bank of America has admitted that it has copied and distributed at least a thousand copies of the PMM materials covered by the PMM copyrights to its employees. On information and belief, Bank of America has also made the PMM materials available to its employees through its company intranet, and the PMM materials have been downloaded innumerable times by the bank's employees.

Complaint -

4

15.    In October, 2005 IPS' President met with David Wells, an executive of Bank of America, to attempt to resolve the instant dispute. Those efforts were unavailing. IPS then sought to resolve the dispute during a telephone call between representatives from Bank of America and IPS, which was also unsuccessful. On December 8, 2006 Plaintiff's President and CEO corresponded with Bank of America's project manager for the project embodied in SOW#3 concerning Bank of America's infringement of IPS's intellectual property rights and of its right to be paid for each copy of the PMM Materials Bank of America had made. Bank of America did not respond to the aforementioned letter until February 27, 2007, when it sent a letter denying liability to IPS.

16.    Plaintiff IPS has complied with all of its obligations under the aforesaid agreements except for those provisions they were prevented from performing by Defendants.

## FIRST CAUSE OF ACTION
### (Copyright Infringement)

17.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 16 above.

18.    Bank of America has copied, reproduced and distributed, and aided and abetted the copying, reproduction, and distribution of, Plaintiff's PMM Materials, which are protected by copyright.

19.    The Bank of America did not obtain permission from Plaintiff to copy, reproduce or distribute Plaintiff's PMM Materials before performing the acts alleged herein.

Complaint -

20.     Plaintiff has secured the exclusive rights and privileges in and to the copyrights on the aforesaid PMM Materials as alleged herein.

21.     The Bank of America is liable to Plaintiff for the actual damages incurred as a result of the aforesaid infringements and any additional profits of Bank of America attributable to such infringement.

22.     In the alternative, Plaintiff is entitled to recovery of statutory damages in the amount of $30,000 from each Defendant for each of Plaintiff's copyrighted works infringed, pursuant to 17 U.S.C. §504(c), plus attorneys' fees and costs.

23.     Bank of America is also liable for each infringement by its employees, in that it caused, induced, and encouraged its employees to download and/or make a copy of Plaintiff's copyrighted PMM Materials.

24.     Bank of America is also vicariously liable for the infringement of its employees, in that it had the right and ability to supervise its employees, was aware that its employees were infringing Plaintiff's copyrighted PMM Materials, and had a financial interest in such copying.

25.     In addition, the aforementioned acts of Defendants were done wilfully. Plaintiff is therefore entitled to recovery of enhanced statutory damages of $150,000 for each work infringed, pursuant to 17 U.S.C. §504(c)(2).

26.     Plaintiff is informed and believes and thereon alleges that each Defendant is continuing to copy, reproduce and distribute Plaintiff's PMM Materials without Plaintiff's permission. The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant

Complaint -

6

to 17 U.S.C. §§502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiffs' copyrights.

### SECOND CAUSE OF ACTION
(For Breach of Contract)

27.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 16 above.

28.     On various dates beginning in or about November, 2005, Bank of America breached the aforesaid contracts by failing to pay Plaintiff the full amount due to Plaintiff thereunder.

29.     As a result of Bank of America's breach of contract, Plaintiff has suffered damages exceeding several hundred thousand dollars.

### THIRD CAUSE OF ACTION
(For Breach of Covenant of Good Faith and Fair Dealing)

30.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 16 and 28 and 29 above.

31.     Bank of America breached the covenant of good faith and fair dealing by the foregoing acts, which have deprived IPS of the full benefits of the parties' contracts.

32.     Plaintiff IPS has suffered damages proximately caused by Defendants' breaches as aforesaid, in an amount to be proved at trial.

Complaint -

1    WHEREFORE PLAINTIFF PRAYS:

2    For First Cause of Action

3    1.    For damages according to proof;

4    2.    For profits attributable to Defendants' infringement of Plaintiff's copyright,

5

6    according to proof;

7    3.    For statutory damages as provided by 17 U.S.C. §504(c);

8    4.    For attorney's fees;

9    5.    That Defendants and their employees be enjoined during the pendency of

10

11    this action and permanently from copying, reproducing or distributing Plaintiff's PMM

12    Materials without Plaintiff's consent;

13    For Second and Third Causes of Action

14    6.    For an accounting to ascertain the number of participants in Bank of

15    America's s PMM courses, from March, 2005 through the present date;

16    7.    For damages according to proof;

17

18    For All Causes of Action

19    7.    For cost of suit incurred herein; and

20    8.    For such other and further relief as the Court deems just and proper.

21

22    Dated: May 22, 2007              TRIAL & TECHNOLOGY LAW GROUP
                                      A Professional Corporation
23                                    Attorneys for Plaintiff
                                      IP SOLUTIONS, INC.
24

25                              By: _____

26                                    Robert A. Spanner

27

28
Complaint -

8

1

## **DEMAND FOR JURY TRIAL**

2

Pursuant to F.R. Civ. P. 38, Plaintiff demands trial by jury.

3

4      Dated: May 22, 2007                    TRIAL & TECHNOLOGY LAW GROUP
                                              A Professional Corporation
5                                             Attorneys for Plaintiff
                                              IP SOLUTIONS, INC.
6

7
                                       By: _____
8                                             Robert A. Spanner

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint -

9

# EXHIBIT 1

# GENERAL SERVICES AGREEMENT



**Bank of America**

| | |
|---|---|
| Agreement Number: | 25048-001-001 |
| Effective Date: | November 17, 2003 |
| Expiration Date: | December 31, 2004 |
| Supplier Name: | IP Solutions, Inc. (dba IPS Associates) |
| Supplier Address: | 160 Bovet Road, Suite 400, San Mateo, CA 94402 |
| Supplier Telephone: | 650-578-6300 |

This GENERAL SERVICES AGREEMENT ("Agreement") is entered into as of the Effective Date by and between Bank of America Technology and Operations, Inc. ("BATO"), a Delaware corporation and the above-named Supplier, a Delaware corporation, and consists of this signature page and, the attached Terms and Conditions, Schedules and all other documents attached hereto, which are incorporated in full by this reference.

Supplier expressly acknowledges and agrees that the rights of BATO set forth in this Agreement shall inure to all its Affiliates.

IP Solutions, Inc.
(dba IPS Associates)
("Supplier")

By: _William Malek_

Name: _William Malek_

Title: _CEO_

Date: _November 20, 2003_

Address for Notices:
*See above*

Bank of America Technology
and Operations, Inc.
("BATO")

By: _Greg Richardson_

Name: _____ Greg Richardson _____

Title: _____ VP; Sourcing Manager _____

Date: _____ 11-17-03 _____

Address for Notices:
Bank of America Supply Chain Management
NC1-023-09-01
525 North Tryon Street
Charlotte, NC 28255
ATTN: Greg Richardson (Agreement #25048)
Telephone:704.386.6224
Facsimile:704.386.8213

*Bank of America Confidential*
Rev. 10/22/02



# TABLE OF CONTENTS

| SECTION NO. | SECTION HEADING |
|---|---|
| 1.0 | Definitions |
| 2.0 | Scope of the Agreement |
| 3.0 | Term of Agreement |
| 4.0 | Termination |
| 5.0 | Pricing/Fees |
| 6.0 | Invoices/Taxes/Payment |
| 7.0 | Mutual Representations and Warranties |
| 8.0 | Representations and Warranties of Supplier |
| 9.0 | Financial Responsibility |
| 10.0 | Business Continuity |
| 11.0 | Relationship of the Parties |
| 12.0 | Supplier Personnel |
| 13.0 | Insurance |
| 14.0 | Confidentiality and Information Protection |
| 15.0 | Indemnity |
| 16.0 | Limitation of Liability |
| 17.0 | Supplier Diversity and Development Initiative |
| 18.0 | Environmental Initiative |
| 19.0 | Audit |
| 20.0 | Non-Assignment |
| 21.0 | Governing Law |
| 22.0 | Dispute Resolution |
| 23.0 | Mediation/Arbitration |
| 24.0 | Non-Exclusive Nature of Agreement |
| 25.0 | Ownership of Work Product |
| 26.0 | Miscellaneous |
| 27.0 | Entire Agreement |
| | |
| SCHEDULE A | STATEMENT OF WORK |

**1.0    DEFINITIONS:** all capitalized terms in this Agreement not defined in this Section shall have the meanings set forth in the Sections or Schedules of this Agreement in which they are defined.

1.1    Affiliate - a business entity now or hereafter controlled by, controlling or under common control with a Party.  Control exists when an entity owns or controls more than 50% of the outstanding shares or securities representing the right to vote for the election of directors or other managing authority of another entity.

1.2    Bank of America – BATO and its Affiliates.

1.3    Business Day – Monday through Friday, excluding days on which Bank of America is not open for business in the United States of America.

1.4    Intellectual Property Rights - all intellectual property rights throughout the world, including copyrights, patents, mask works, trademarks, trade secrets, authors' rights, rights of attribution, and other proprietary rights and all applications and rights to apply for registration or protection of such rights.

1.5    Order - purchase order, work order or other written instrument executed, or if agreed to by the Parties, electronic transmissions, originated by an authorized officer of Bank of America **Supply Chain Management** directing Supplier in the provision of Services.

1.6    Party – BATO or Supplier.

1.7    Representative – an employee, officer, director, or agent of a Party.

1.8    Services - the services this Agreement obligates Supplier to render or Supplier provides, including without limitation all professional, management, labor and general services, together with any materials, supplies, tangible items or other goods Supplier furnishes in connection with the Services.

1.9    Subcontractor – a third party to whom Supplier has delegated or subcontracted any portion of its obligations set forth herein.

1.10    Term – the initial term of the Agreement or any renewal or extension.

1.11    Work Product – All information, data, materials, discoveries, inventions, works of authorship, documents, documentation, models, computer programs, designs, drawings, specifications, processes, procedures, techniques, algorithms, diagrams, methods, and all tangible embodiments of each of the foregoing (in whatever form and media) and all Intellectual Property Rights therein originated or prepared by or for Supplier pursuant to this Agreement or within the scope of Services provided under this Agreement, whether or not prepared on Bank of America's premises.



## 2.0   SCOPE OF THE AGREEMENT:

2.1   Supplier shall perform the Services in accordance with this Agreement and the specifications and timeframes set forth in SCHEDULE A.

2.2   All instruments, such as Orders, acknowledgments, invoices, schedules and the like used in conjunction with this Agreement ("Instruments") shall be for the sole purpose of defining quantities, prices and describing Services or products to be provided hereunder, and to this extent only are incorporated as a part of this Agreement.   Any preprinted terms and conditions included in Instruments shall not be incorporated and such Instrument shall be construed to modify, amend, or alter the terms of this Agreement solely for the purpose stated in the preceding sentence. Preprinted, standard, or posted terms and conditions in any media (including terms where acquiescence requires only a mouse click) shall not be incorporated into nor construed to amend the terms of this Agreement. Any Instrument submitted to BATO by Supplier in connection with this Agreement shall reference, as applicable, Order number and Agreement number.

## 3.0   TERM OF AGREEMENT: This Agreement shall be in effect from the Effective Date through the Expiration Date indicated on the signature page ("**Initial Term**") unless terminated earlier or extended under the terms of this Agreement.   BATO shall have the right to extend this Agreement for an additional one (1) year period ("Renewal Term") by giving Supplier written notice of its intent at least 30 calendar days prior to the end of the Initial Term or any Renewal Term.   If BATO does not notify Supplier of its intent to renew or terminate this Agreement, the Agreement shall continue in effect on a month-to-month basis, at the prices in effect in SCHEDULE A, for the Term just expired, until terminated by either Party upon at least 30 calendar days prior written notice to the other.

## 4.0   TERMINATION:

4.1   BATO may terminate this Agreement for its convenience, without cause, at any time without further charge or expense upon at least 45 calendar days prior written notice to Supplier.

4.2   In addition to any other remedies available to either Party, upon the occurrence of a Termination Event (as defined below) with respect to either Party, the other Party may immediately terminate this Agreement by providing written notice of termination.   A Termination Event shall have occurred if:  (a) a Party materially breaches its obligations under this Agreement, and the breach is not cured within 30 calendar days after written notice of the breach and intent to terminate is provided by the other Party; (b) a Party becomes insolvent (generally unable to pay its debts as they become due) or the subject of a bankruptcy, conservatorship, receivership or similar proceeding, or makes a general assignment for the benefit of its creditors; (c) Supplier either:  (i) merges with another entity, (ii) suffers a transfer involving fifty percent (50%) or more of any class of its voting securities or (iii) transfers all, or substantially all, of its assets; (d) in providing Services hereunder, Supplier violates any law or regulation governing the financial services industry, or causes Bank of America to be in material violation of any law or regulation governing the financial services industry; (e) attempts to assign this Agreement in breach of Section 20.

4.3   Supplier agrees that upon the request of BATO, Supplier will, at no additional cost to BATO, continue uninterrupted operations, conclude and cooperate with BATO in the transition of the business at BATO's direction. The   fees associated with such transition   shall be in accordance with the fees in effect at the expiration or termination of this Agreement.   In no event shall said transition be more than [180] calendar days from the date of termination.



Reimbursement of all extraordinary costs and expenses incurred outside of the Agreement terms and conditions will be agreed upon by Supplier and BATO prior to the transition.

4.4    The rights and obligations of the Parties which by their nature must survive termination or expiration of this Agreement in order to achieve its fundamental purposes including, without limitation, the provisions of the following Sections, AUDIT, CONFIDENTIALITY AND INFORMATION PROTECTION, INDEMNITY, LIMITATION OF LIABILITY, MEDIATION/ARBITRATION, OWNERSHIP OF WORK PRODUCT and MISCELLANEOUS, shall survive any termination of this Agreement.

**5.0    PRICING/FEES:**

5.1    BATO shall pay Supplier for Services provided under this Agreement as set forth in SCHEDULE A.

5.2    BATO shall not be required to pay for Services that are: (a) not requested by Bank of America and documented in an Order, or (b) not meeting the requirements of this Agreement. Fees for additional Services not listed on SCHEDULE A shall be as mutually agreed in writing between BATO and Supplier prior to performance. No fees for additional Services shall be due unless such Services and fees are agreed to in writing by BATO prior to Supplier's performance thereof.

**6.0    INVOICES/TAXES/PAYMENT:**

6.1    Supplier shall submit monthly, written invoices, in duplicate, to the address set forth below. BATO reserves the right to require invoicing and payment through electronic media at any time upon reasonable prior written notice. Invoices shall contain such detail as BATO may reasonably require from time to time. Amounts shall be invoiced promptly after the Services performed or Work Product delivered. Amounts not invoiced by Supplier to BATO within three (3) months after such amounts could first be invoiced under this Agreement may not thereafter be invoiced, and BATO shall not be required to pay such amounts.

6.2    Invoices omitting this Agreement reference number and Order number if applicable, or that are incorrect, incomplete or list Services that were not requested in writing by Bank of America will not be paid but will be returned to Supplier for correction.

6.3    BATO shall pay Supplier for all Services and applicable taxes invoiced in arrears in accordance with the terms of this Agreement, within 30 net days of receipt of a valid invoice by BATO.

6.4    Unless otherwise specified, invoices shall include and list all applicable taxes as separate line items. BATO will reimburse Supplier for all sales, use or excise taxes levied on amounts payable by BATO to Supplier pursuant to this Agreement, however, BATO shall not be responsible for remittance of such taxes to applicable tax authorities.

6.5    BATO shall not be responsible for any ad valorem, income, gross receipts, franchise, privilege, value added or occupational taxes of Supplier. BATO and Supplier shall each bear sole responsibility for all taxes, assessments and other real or personal property-related levies on its owned or leased real or personal property.

6.6    Supplier shall be responsible for the payment of all interest and penalties related to any taxes assessed or levied as contemplated by Section 6.4 to the extent that Supplier fails to accurately and timely invoice BATO for such taxes and remit such taxes directly to the



applicable taxing authority; provided, however, in no event shall Supplier be responsible for the payment of the underlying tax liability, which tax liability shall always be a liability of BATO.

6.7     Supplier shall cooperate with BATO's efforts to identify taxable and nontaxable portions of amounts payable pursuant to this Agreement (including segregation of such portions on invoices) and to obtain refunds of taxes paid, where appropriate. BATO may furnish Supplier with certificates or other evidence supporting applicable exemptions from sales, use or excise taxation. If BATO pays or reimburses Supplier under this Section, Supplier hereby assigns and transfers to BATO all of its right, title and interest in and to any refund for taxes paid. Any claim for refund of taxes against the assessing authority may be made in the name of Bank of America or Supplier, or both, at BATO's option. Bank of America may initiate and manage litigation brought in the name of Bank of America or Supplier, or both, to obtain refunds of amounts paid under this Section. Supplier shall cooperate fully with BATO in pursuing any refund claims, including any related litigation or administrative procedures.

6.8     Supplier shall keep and maintain complete and accurate accounting records in accordance with generally accepted accounting principles consistently applied to support and document all amounts becoming payable to Supplier hereunder. Upon request from BATO, Supplier shall provide to BATO (or a representative designated by BATO) access to such records for the purpose of auditing such records during normal business hours. Supplier shall retain all records required under this Section 6.8 in accordance with Section 19 of this Agreement, after the amounts documented in such records become due.

7.0     MUTUAL REPRESENTATIONS AND WARRANTIES: Each Party represents and warrants the following: (a) the Party's execution, delivery and performance of this Agreement: (i) have been authorized by all necessary corporate action, (ii) do not violate the terms of any law, regulation, or court order to which such Party is subject or the terms of any material agreement to which the Party or any of its assets may be subject and (iii) are not subject to the consent or approval of any third party; (b) this Agreement is the valid and binding obligation of the representing Party, enforceable against such Party in accordance with its terms; and (c) such Party is not subject to any pending or threatened litigation or governmental action which could interfere with such Party's performance of its obligations hereunder.

8.0     REPRESENTATIONS AND WARRANTIES OF SUPPLIER:

8.1     Supplier represents and warrants to BATO as follows: (a) Supplier is in good standing in the state of its incorporation and is qualified to do business as a foreign corporation in each of the other states in which it is providing Services hereunder; and (b) Supplier shall secure or has secured all permits, licenses, regulatory approvals and registrations required to render Services set forth herein, including without limitation, registration with the appropriate taxing authorities for remittance of taxes.

8.2     Supplier represents and warrants that it shall perform the Services in a timely and professional manner using competent personnel having expertise suitable to their assignments. Supplier represents and warrants that the Services shall conform to or exceed, in all material respects, the specifications described herein, as well as the standards generally observed in the industry for similar services. Supplier represents and warrants that neither performance nor functionality of the Services, products or systems is or will be affected by dates prior to, during and after the year 2000. Supplier represents and warrants that Services supplied hereunder shall be free of defects in workmanship, design and



material. Supplier represents and warrants that the Services and any materials provided by Supplier to Bank of America under this Agreement do not and shall not infringe, misappropriate or otherwise violate any Intellectual Property Rights.

8.3   Supplier shall, and shall be responsible for ensuring that Supplier's Representatives and Subcontractors shall, perform all obligations of Supplier under this Agreement in compliance with all laws, rules, regulations and other legal requirements.

8.4   THE WARRANTIES CONTAINED IN THIS AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.0   **FINANCIAL RESPONSIBILITY:** Supplier shall, promptly upon BATO's request, furnish its financial statements as prepared by or for Supplier in the ordinary course of its business for the purpose of determining Supplier's ability to perform its duties hereunder. To the extent such financial statements are not otherwise publicly available, they shall be deemed Supplier Confidential Information and shall be used by BATO solely for the purpose of determining Supplier's ability to perform its duties hereunder. If BATO's review of financial statements causes BATO to question Supplier's ability to perform its duties hereunder, BATO may request, and Supplier shall provide to BATO, reasonable assurances of Supplier's ability to perform its duties hereunder. Failure by Supplier to provide such reasonable assurances to BATO shall be deemed a material breach of this Agreement. Furthermore, Supplier shall notify BATO immediately in the event there is a change of control or material adverse change in Supplier's business or financial condition since the last submission of financial statements to BATO.

10.0   **BUSINESS CONTINUITY:** Supplier agrees to establish and maintain contingency plans, recovery plans and proper risk controls to ensure Supplier's continued performance under this Agreement. The plans must be in place within 30 calendar days after the Effective Date of this Agreement and shall include, but not be limited to, testing, control functions, accountability and corrective actions to be immediately implemented, if necessary. Supplier agrees to provide copies of the plans to BATO upon request.

11.0   **RELATIONSHIP OF THE PARTIES:** The Parties are independent contractors. Nothing in this Agreement or in the activities contemplated by the Parties hereunder shall be deemed to create an agency, partnership, employment or joint venture relationship between the Parties or any of their Subcontractors or Representatives.

12.0   **SUPPLIER PERSONNEL:**
12.1   Supplier's personnel are not eligible to participate in any of the employee benefit or similar programs of Bank of America. Supplier shall inform all of its personnel providing Services pursuant to this Agreement that they will not be considered employees of Bank of America for any purpose, and that Bank of America shall not be liable to any of them as an employer for any claims or causes of action arising out of or relating to their assignment.

12.2   Upon the request of BATO, Supplier shall immediately remove any of Supplier's Representatives or Subcontractors performing Services under this Agreement at Bank of America's premises and replace such Representative or Subcontractor as soon as practicable. Upon the request of BATO, Supplier shall promptly, and after consultation with BATO, address any concerns or issues raised by BATO regarding any of Supplier's Representatives or Subcontractors performing Services under this Agreement at premises



other than Bank of America premises, which may include, as appropriate, replacing such Representative or Subcontractor from the Bank of America account.

12.3    The engagement of a Subcontractor by Supplier shall be subject to BATO's prior written consent, which shall not be unreasonably withheld, and shall not relieve Supplier of any of its obligations under this Agreement. Supplier shall be responsible for the performance or nonperformance of its Subcontractors as if such performance or nonperformance were that of Supplier. Supplier shall require all Subcontractors, as a condition to their engagement, to agree to be bound by provisions substantially the same as those included in this Agreement particularly the Sections entitled "Supplier Personnel", "Insurance", "Confidentiality and Information Protection" and "Business Continuity ".

12.4    Supplier shall comply and shall cause its Representatives and Subcontractors to comply with all personnel, facility, safety and security rules and regulations and other instructions of Bank of America, when performing work at a Bank of America facility, and shall conduct its work at Bank of America facilities in such a manner as to avoid endangering the safety, or interfering with the convenience of, Bank of America Representatives or customers. Supplier understands that Bank of America operates under various laws and regulations that are unique to the security-sensitive banking industry. As such, persons engaged by Supplier to provide Services under this Agreement are held to a higher standard of conduct and scrutiny than in other industries or business enterprises. Supplier agrees that its Representatives and Subcontractors providing Services hereunder, shall possess appropriate character, disposition and honesty. Supplier shall. to the extent permitted by law, exercise reasonable and prudent efforts to comply with the security provisions of this Agreement.

12.5    Supplier shall not knowingly permit a Representative or Subcontractor to have access to the premises, records or data of Bank of America when such Representative or Subcontractor: (a) has been convicted of a crime or has agreed to or entered into a pretrial diversion or similar program in connection with: (i) a dishonest act or a breach of trust, as set forth in Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. 1829(a); or (ii) a felony; or (b) uses illegal drugs.

12.6    Supplier represents that it maintains comprehensive hiring policies and procedures which include, among other things, a background check for criminal convictions, and if requested by Bank of America, drug testing, all to the extent permitted by law. Supplier further represents that through its hiring policies and procedures including background checks, it endeavors to hire the best candidates with appropriate character, disposition, and honesty.

   12.6.1    Supplier shall be responsible, at Supplier's cost, for conducting background investigations of Supplier employees who perform Services for Bank of America. Such investigations shall include, but not be limited to: (a) a search of the Representatives and/or Subcontractors social security number or other appropriate identification number to verify the accuracy of the individuals identity and current and previous address(es); and (b) a criminal background search of all court records in each venue of Representative's and/or Subcontractor's previous residences over the past seven (7) years. In the event that Supplier's Representatives and/or Subcontractors maintain or have maintained residences outside of the United States, the Parties shall agree upon the appropriate background checks. To satisfy its obligations in this Section, Supplier may elect to utilize the services of BATO's third party service provider to obtain the required background investigations.



12.6.2 In the event that Supplier employs non-U.S. citizens to provide Services hereunder, Supplier shall insure that all such persons have and maintain appropriate visas to enable them to provide the Services.

12.7 BATO shall notify Supplier of any act of dishonesty or breach of trust committed against Bank of America which may involve a Supplier Representative or Subcontractor of which BATO becomes aware, and Supplier shall notify BATO if it becomes aware of any such offense. Following such notice, at the request of BATO and to the extent permitted by law, Supplier shall cooperate with investigations conducted by or on behalf of Bank of America.

## 13.0   INSURANCE:

13.1 Supplier shall at its own expense secure and maintain, and shall require its Subcontractors to secure and maintain, throughout the Term, the following insurance with companies qualified to do business in the jurisdiction in which the Services will be performed and rating A-VII or better in the current *Best's Insurance Reports* published by A. M. Best Company and shall furnish to BATO certificates and required endorsements evidencing such insurance prior to commencing work and naming Bank of America as an additional insured by endorsement to the policies described in (B) and (C) below. Said certificates shall state the amount of all deductibles and shall contain evidence that the policy or policies shall not be canceled or altered without at least 30 calendar days prior written notice to BATO. The insurance coverages and limits required to be maintained by Supplier and its Subcontractors shall be primary to insurance coverage, if any, maintained by Bank of America. Supplier and its Subcontractors and their underwriters shall waive subrogation against Bank of America.

(A)   Worker's Compensation Insurance which shall fully comply with the statutory requirements of all applicable state and federal laws and Employers' Liability Insurance which limit shall be $1,000,000 per accident for Bodily Injury and $1,000,000 per employee/aggregate for disease.

(B)   Commercial General Liability Insurance with a minimum combined single limit of liability of $2,000,000 per occurrence and $2,000,000 aggregate per location for bodily injury, death, property damage and personal injury. This policy shall include products/completed operations coverage and shall also include contractual coverage.

(C)   Excess coverage with respect to (A) and (B) above with a minimum combined single limit of $5,000,000.

## 14.0   CONFIDENTIALITY AND INFORMATION PROTECTION:

14.1 The term "Confidential Information" shall mean this Agreement and all data, trade secrets, business information and other information of any kind whatsoever that a Party ("Discloser") discloses, in writing, orally, visually or in any other medium, to the other Party ("Recipient") or to which Recipient obtains access and that relates to Discloser or, in the case of Supplier, to Bank of America or its customers, employees, third-party vendors or licensors. Confidential Information includes Customer Information, as defined below. A "writing" shall include an electronic transfer of information by e-mail, over the Internet or otherwise.

14.2 Supplier acknowledges that Bank of America has a responsibility to its customers and other consumers using its services to keep information it has received or produced about their usage of its services and about their accounts ("Customer Information") strictly confidential. Each of the Parties, as Recipient, hereby agrees that it will not, and will cause its Representatives, consultants, Affiliates and independent contractors not to disclose Confidential Information of the

other Party, including Customer Information, during or after the Term of this Agreement, other than on a "need to know" basis and then only to: (a) Affiliates of Bank of America; (b) Recipient's employees or officers; (c) Affiliates of Recipient, its independent contractors at any level, agents and consultants, provided that all such persons are subject to a written confidentiality agreement that shall be no less restrictive than the provisions of this Section; (d) pursuant to the exceptions set forth in 15 U.S.C 6802(e) and accompanying regulations, which disclosures are made in the ordinary course of business and (e) as required by law or as otherwise expressly permitted by this Agreement. Recipient shall not use or disclose Confidential Information of the other Party for any purpose other than to carry out this Agreement. Recipient shall treat Confidential Information of the other Party with no less care than it employs for its own Confidential Information of a similar nature that it does not wish to disclose, publish or disseminate, but not less than a reasonable level of care.

14.3    Recipient shall notify Discloser of any actual or threatened requirement of law to disclose Confidential Information promptly upon receiving actual knowledge thereof and shall cooperate with Discloser's reasonable, lawful efforts to resist, limit or delay disclosure. Nothing in this Section shall require any notice or other action by Bank of America in connection with requests or demands for Confidential Information by bank examiners.

14.4    The obligations of confidentiality in this Section shall not apply to any information that (i) Recipient rightfully has in its possession when disclosed to it, free of obligation to Discloser to maintain its confidentiality; (ii) Recipient independently develops without access to Discloser's Confidential Information; (iii) is or becomes known to the public other than by breach of this Section or (iv) is rightfully received by Recipient from a third party without the obligation of confidentiality. Any combination of Confidential Information disclosed with information not so classified shall not be deemed to be within one of the foregoing exclusions merely because individual portions of such combination are free of any confidentiality obligation or are separately known in the public domain.

14.5    Neither Party shall issue any media releases, public announcements and public disclosures, relating to this Agreement or use the name or logo of the other Party, including, without limitation, in promotional or marketing material or on a list of customers, provided that nothing in this paragraph shall restrict any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the releasing Party.

14.6    Bank of America may disclose Products and Services to contractors for the purpose of further handling, processing, modifying and adapting them for the exclusive use of Bank of America, provided that such contractors have agreed to observe in substance the obligations of Bank of America set forth in this Section.

14.7    Supplier acknowledges that Bank of America is required to comply with the information security standards required by the Gramm-Leach-Bliley Act (15 U.S.C. 6801, 6805(b)(1)) and the regulations issued thereunder (12 C.F.R. Part 40) and with other statutory, legal and regulatory requirements as well as its internal information security program for information protection. If applicable, Supplier shall make reasonable efforts to assist Bank of America to so comply and to conform with its own policies for information protection. Supplier's information security program shall contain at least those elements specified by BATO after consultation with Supplier. At BATO's request Supplier shall make commercially reasonable modifications to its information security program or to the procedures and practices thereunder to conform to BATO's security requirements as they exist from time to time. Supplier shall require any Subcontractors who hold Confidential Information to implement an information protection program and plan substantially equivalent to Supplier's.


14.7.1 Prior to allowing Supplier to access Bank of America Customer Information or within thirty (30) days of BATO's written request, Supplier shall deliver to Bank of America's information protection department a copy of its written information security program. The program shall be designed to:

1. Ensure the security, integrity and confidentiality of Confidential Information;
2. Protect against any anticipated threats or hazards to the security or integrity of such information; and
3. Protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to the person that is the subject of such information.

**15.0   INDEMNITY:**

15.1   Supplier shall indemnify, defend, and hold harmless Bank of America and its Representatives, successors and permitted assigns from and against any and all claims made or threatened by any third party and all related losses, expenses, damages, costs and liabilities, including reasonable attorneys' fees and expenses incurred in investigation or defense ("Damages"), to the extent such Damages arise out of or relate to the following: (a) any negligent act or omission or willful misconduct by Supplier, its Representatives or any Subcontractor engaged by Supplier in the performance of Supplier's obligations under this Agreement; or (b) any breach in a representation, covenant or obligation of Supplier contained in this Agreement.

15.2   Supplier shall defend or settle at its expense any claim, suit or proceeding arising from or alleging infringement, misappropriation or other violation of any Intellectual Property Right of any third party by product furnished under this Agreement. Supplier shall indemnify and hold Bank of America and its Representatives and customers harmless from and against and pay any and all losses, costs and damages. including royalties and license fees and reasonable counsel fees attributable to such claim, suit or proceeding. BATO shall give Supplier prompt notice of, and the Parties shall cooperate in, the defense of any such claim, suit or proceeding, including appeals, negotiations and any settlement or compromise thereof, provided that BATO must approve the terms of any settlement or compromise that may impose any unindemnified or nonmonetary liability on Bank of America.

15.2.1   If any product furnished under this Agreement, including, without limitation, software, service, system design, equipment or documentation, becomes, or in Bank of America's or Supplier's reasonable opinion is likely to become, the subject of any claim, suit, or proceeding arising from or alleging facts that if true would constitute infringement, misappropriation or other violation of, or in the event of any adjudication that such product infringes, misappropriates or otherwise violates, any Intellectual Property Right of a third party, Supplier, at its own expense, shall take the following actions in the listed order of preference: (a) secure for Bank of America the right to continue using the product; or if commercially reasonable efforts are unavailing. (b) replace or modify the product to make it non-infringing; provided, however, that such modification or replacement shall not degrade the operation or performance of the product.

15.2.2   The indemnity in the preceding provision, shall not extend to any claim of infringement resulting from Bank of America's modification of the product or from use or incorporation of product in a manner for which the product is not designed


with products not provided by Supplier or by Bank of America or for Bank of America with Supplier's approval.

**16.0    LIMITATION OF LIABILITY:** Neither Party shall be liable to the other for any special, indirect, incidental, consequential, punitive or exemplary damages, including, but not limited to, lost profits, even if such Party alleged to be liable has knowledge of the possibility of such damages, provided, however, that the limitations set forth in this Section shall not apply to or in any way limit the indemnity obligations of Section 15, the confidentiality and information protection obligations or Supplier's gross negligence or willful misconduct.

**17.0    SUPPLIER DIVERSITY AND DEVELOPMENT INITIATIVE:**

17.1    Supplier recognizes the Bank of America Supplier Diversity and Development Initiative supporting minority, woman and disabled owned business enterprises and is committed to the participation of minority, woman and disabled owned business enterprises in its construction, procurement and professional services programs.

17.2    Definitions: For purposes of this Agreement, the following are the definitions of:

(a)    "Minority Owned Business Enterprise" means a "for profit" enterprise, regardless of size, physically located in the United States or its trust territories, which is at least fifty-one percent (51%) owned, operated and controlled. by one or more member(s) of a Minority Group who maintain United States citizenship.

(b)    "Minority Group" means any group of African American, Hispanic American, Native American (American Indian, Eskimo, Aleut. and native Hawaiian), Asian-Pacific American, or other minority group as recognized by the United States Small Business Administration Office of Minority Small Business and Capital Ownership Development.

(c)    "Woman Owned Business Enterprise" means a "for profit" enterprise. regardless of size. located in the United States or its trust territories, which is at least fifty-one percent (51%) owned, operated and controlled by one or more women of United States citizenship.

(d)    "Disabled Owned Business Enterprise" means a "for profit" enterprise regardless of size, located in the United States or its trust territories. which is at least fifty-one percent (51%) owned, operated and controlled, by one or more person(s), of United States citizenship, having a chronic and ongoing mental or physical impairment that substantially limits one or more of the major life activities and that has a significant negative impact on that person's entry into or advancement in the business world.

(e)    To qualify as a Minority or Woman Owned Business Enterprise under this Agreement, the business enterprise must be certified by an agency acceptable to BATO or in the case of a Disabled Owned Business Enterprise. the business enterprise must qualify through the Minority Business Development Disabled Owned Business Enterprise vendor certification application process.

17.3    Participation:

[Supplier must choose option A or option B]



(A)   Supplier represents it is a (Minority, Woman or Disabled) Owned Business Enterprise and is so certified by an agency acceptable to BATO. Supplier shall immediately notify BATO, if during the Term of this Agreement, it is no longer certified or qualified as being a (Minority, Woman or Disabled) Owned Business Enterprise.

OR

(B)   Supplier represents it is not a (Minority, Woman or Disabled) Owned Business Enterprise and agrees to the following:

17.4   In connection with supplying products or Services to Bank of America under this Agreement, Supplier shall endeavor to obtain from certified Minority, Woman and Disabled Owned Business Enterprise(s), as suppliers or Subcontractors to Supplier, a quantity of goods and Services that is equal to or greater in dollar amount to fifteen (15%) percent of the total dollar amount invoiced to Bank of America for products and/or Services under this Agreement.

18.0   **ENVIRONMENTAL INITIATIVE:** Supplier acknowledges that BATO encourages each supplier with which it enters into an agreement for the provision of goods or services to use, consistent with the efficient performance of such agreements, recycled paper goods, and to implement and adhere to other environmentally beneficial policies and practices. Supplier warrants that Supplier uses environmentally beneficial practices specific to its industry that meet at least the minimum standard recommended for its industry. Upon Bank of America's request, Supplier will provide written information on its environmental policies and procedures.

19.0   **AUDIT:** Supplier shall maintain at no additional cost to BATO, in a reasonably accessible location, all records pertaining to its products and services provided to Bank of America under this Agreement for a period of seven (7) years or as required by law, if longer. Such Supplier records referenced above may be inspected, audited and copied by Bank of America, its Representatives or by federal or state agencies having jurisdiction over Bank of America, during normal business hours and at such reasonable times as Bank of America may determine. Supplier shall give prior notice to Bank of America of requests by federal and/or state authorities to examine Bank of America records. At Bank of America's written request, Supplier shall reasonably cooperate with Bank of America in seeking a protective order with respect to such records.

20.0   **NON-ASSIGNMENT:** Neither Party may assign this Agreement or any of the rights hereunder or delegate any of is obligations hereunder, without the prior written consent of the other Party, and any such attempted assignment shall be void, except that BATO or any permitted BATO assignee may assign any of its rights and obligations under this Agreement to any BATO Affiliate, the surviving corporation with or into which BATO or such assignee may merge or consolidate or an entity to which BATO or such assignee transfers all, or substantially all, of its business and assets.

21.0   **GOVERNING LAW.** This Agreement shall be governed by the internal laws, and not by the laws regarding conflicts of laws, of the State of North Carolina. Each Party hereby submits to the exclusive jurisdiction of the courts of such state, and waives any objection to venue with respect to actions brought in such courts. This provision shall not be construed to conflict with the provisions of the Section entitled "Mediation/Arbitration".

22.0   **DISPUTE RESOLUTION:** The following procedure will be adhered to in all disputes arising under this Agreement which the Parties cannot resolve informally. The aggrieved Party shall

notify the other Party in writing of the nature of the dispute with as much detail as possible about the deficient performance of the other Party. The Relationship Managers shall meet (in person or by telephone) within seven days after the date of the written notification to reach an agreement about the nature of the deficiency and the corrective action to be taken by the respective Parties. The Relationship Managers shall produce a report about the nature of the dispute in detail to their respective management. If the Relationship Managers do not meet or are unable to agree on corrective action, senior managers of the Parties having authority to resolve the dispute without the further consent of any other person ("Management") shall meet or otherwise act to facilitate an agreement within 14 calendar days of the date of the written notification. If Management do not meet or cannot resolve the dispute or agree upon a written plan of corrective action to do so within seven days after their initial meeting or other action, or if the agreed-upon completion dates in the written plan of corrective action are exceeded, either Party may request mediation and/or arbitration as provided for in this Agreement. Except as otherwise specifically provided, neither Party shall initiate arbitration, mediation or litigation unless and until this dispute resolution procedure has been substantially complied with or waived. Failure of a Party to fulfill its obligations in this Section, including failure to meet timely upon the other Party's notice, shall be deemed such a waiver.

23.0   **MEDIATION/ARBITRATION:** In the event of any dispute arising out of or relating to this Agreement that the parties are unable to resolve in accordance with the dispute resolution procedure set forth in Section 22, the parties will in good faith attempt to resolve such dispute through non-binding mediation before a mediator acceptable to both sides; provided however, that a dispute relating to infringement of intellectual property right or confidentiality shall not be subject to this Section 23. Any controversy or claim, other than those specifically excluded, between or among the parties hereto not resolved through mediation shall be determined by binding arbitration in accordance with the United States Arbitration Act (Title 9, U.S. Code), notwithstanding the choice of law provision in this Agreement, and the Rules of Practice and Procedure for the Arbitration of Commercial Disputes of Judicial Arbitration and Mediation Services, Inc./Endispute, Inc. ("J.A.M.S./Endispute"). If J.A.M.S./Endispute is unable or legally precluded from administering the arbitration, then the American Arbitration Association ("AAA") will serve. The arbitration shall be conducted in Charlotte, North Carolina by one independent arbitrator who shall be a retired judge or attorney practicing in the areas of banking and information technology law.

24.0   **NON-EXCLUSIVE NATURE OF AGREEMENT:** Supplier agrees that it shall not be considered Bank of America's exclusive provider of any goods or Services provided hereunder. Bank of America retains the unconditional right to utilize other suppliers in the provision of similar services.

25.0   **OWNERSHIP OF WORK PRODUCT:** Bank of America will own exclusively all Work Product, which shall be "works made for hire" of which Bank of America is the author to the extent permitted under applicable law. To the extent the Work Product is not, as a matter of law, works made for hire, Supplier hereby assigns to Bank of America all right, title and interest (including all Intellectual Property in the Work Product) in and to the Work Product. Supplier shall provide Bank of America upon request with all assistance reasonably required to perfect such right, title and interest, including executing a Confirmation of Assignment specifically naming the items of Work Product. Supplier shall enter into agreements with all of its Representatives and Subcontractors necessary to establish Bank of America's sole ownership in the Work Product. **BANK OF AMERICA ACKNOWLEDGES SUPPLIER'S AND ITS LICENSORS' CLAIMS OF PROPRIETARY RIGHTS IN PREEXISTING WORKS OF AUTHORSHIP AND OTHER INTELLECTUAL PROPERTY SUPPLIER USES IN ITS WORK**

PURSUANT TO THIS AGREEMENT. BANK OF AMERICA DOES NOT CLAIM ANY RIGHT NOT EXPRESSLY GRANTED BY THIS AGREEMENT IN SUCH WORKS OR INTELLECTUAL PROPERTY, WHICH SHALL NOT BE WORK PRODUCT, EVEN IF INCORPORATED WITH WORK PRODUCT IN THE PRODUCT SUPPLIER DELIVERS TO BANK OF AMERICA. Supplier grants Bank of America a perpetual, worldwide, irrevocable, nonexclusive license to any Intellectual Property Rights embedded in the Work Product, which shall permit Bank of America and any transferee or sublicensee of Bank of America, subject to the restrictions in this Agreement, to use such embedded materials as necessary or desirable for, but solely in connection with, the full use of the Work Product.

26.0    **MISCELLANEOUS:**

26.1    BATO and Supplier represent that they are equal opportunity employers and do not discriminate in employment of persons or awarding of subcontracts because of a person's race, sex, age, religion, national origin, veteran or handicap status. Supplier is aware of and fully informed of Supplier's responsibilities and agrees to the provisions under the following: (a) Executive Order 11246, as amended or superseded in whole or in part, and as contained in Section 202 of said Executive Order as found at 41 C.F.R. § 60-1.4(a)(1-7); (b) Section 503 of the Rehabilitation Act of 1973 as contained in 41 C.F.R. § 60-741.4; and (c) The Vietnam Era Veterans' Readjustment Assistance Act of 1974 as contained in 41 C.F.R. § 60-250.4.

26.2    Section headings are included for convenience or reference only and are not intended to define or limit the scope of any provision of this Agreement and should not be used to construe or interpret this Agreement.

26.3    No delay, failure or waiver of either Party's exercise or partial exercise of any right or remedy under this Agreement shall operate to limit, impair, preclude, cancel, waive or otherwise affect such right or remedy. Any waiver by either Party of any provision of this Agreement shall not imply a subsequent waiver of that or any other provision of this Agreement.

26.4    If any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions shall in no way be affected or impaired thereby.

26.5    No amendments of any provision of this Agreement shall be valid unless made by an instrument in writing signed by both Parties specifically referencing this Agreement.

26.6    Subject to any applicable confidentiality obligations. Bank of America may reproduce all documentation and reports provided by Supplier.

26.7    This Agreement may be executed by the Parties in one or more counterparts, and each of which when so executed shall be an original but all such counterparts shall constitute one and the same instrument.

26.8    The remedies under this Agreement shall be cumulative and are not exclusive. Election of one remedy shall not preclude pursuit of other remedies available under this Agreement or at law or in equity. In arbitration a Party may seek any remedy generally available under the governing law. Damages recoverable under this Agreement by BATO shall include damages incurred or suffered by Bank of America.

26.9    Notwithstanding the general rules of construction, both BATO and Supplier acknowledge that both Parties were given an equal opportunity to negotiate the terms and conditions contained

in this Agreement, and agree that the identity of the drafter of this Agreement is not relevant to any interpretation of the terms and conditions of this Agreement.

26.10   All notices or other communications required under this Agreement shall be given to the Parties in writing to the applicable addresses set forth on the signature page, or to such other addresses as the Parties may substitute by written notice given in the manner prescribed in this Section as follows: (a) by first class, registered or certified United States mail, return receipt requested and postage prepaid, (b) over-night express courier or (c) by hand delivery to such addresses. Such notices shall be deemed to have been duly given either five Business Days after the date of mailing as described above or one Business Day after being received by an express courier during business hours.

26.11   Wherever this Agreement requires either Party's approval or consent such approval or consent shall not be unreasonably withheld or delayed.

26.12   This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors and assigns. Except as expressly set forth in this Agreement and with the exception of the Affiliates of BATO, the Parties do not intend the benefits of this Agreement to inure to any third party, and nothing contained herein shall be construed as creating any right, claim or cause of action in favor of any such other third party, against either of the Parties hereto.

26.13   Any transaction undertaken pursuant to this Agreement in which Supplier furnishes services shall be governed by Article 2 of the Uniform Commercial Code as if the services were goods, unless the applicable law of the state of the governing law expressly otherwise provides.

27.0   **ENTIRE AGREEMENT:** This Agreement. the Schedules, and other documents incorporated herein by reference. is the final. full and exclusive expression of the agreement of the Parties and supersedes all prior agreements, understandings, writings, proposals, representations and communications. oral or written, of either Party with respect to the subject matter hereof and the transactions contemplated hereby.



## SCHEDULE A: STATEMENT OF WORK #1 (SOW #1)

Outlined below is SOW #1 which is attached to and incorporated by reference into Agreement # 25048-001-001.

1. **Project Definition:** To provide on-site instructor-led Stanford Advanced Project Management (SAPM) education to Bank of America. This SOW #1 is for piloting classes 2, 3, 4, 5, and 6 for the certification track which may be delivered through multiple modes of delivery.

2. **Deliverables:**

| | | |
|---|---|---|
| #1 | - | Signed Contract |
| #2 | - | Pilot (CSIA) |
| #3 | - | Custom Instruction Analysis Report |
| #4 | - | Pilot classes 2,3 ,4,5,6 (may not be on-site – to be customized depending on type of delivery mode selected by BATO) |

3. **BATO Responsibilities:**
   - Dedicated resource is applied to the Project
   - Identified Executive sponsorship
   - Available resources for the CIA interviews
   - Access to the BATO Learning Strategy
   - Level of customization to be largely delivery-based to protect SAPM certification
   - Review of customized material to be conducted in a timely manner
   - Appropriate qualified resources available to participate in the Pilot
   - Debrief of Pilot is jointly conducted between IPS and BATO
   - 2004 courses effectively marketed within BATO to ensure full participation

4. **Breakdown of *Total Costs (including Travel & Expenses)**

| Service | Price | Percentage Discount | Comments |
|---|---|---|---|
| CIA Report | $10,000 + travel | 50% | May require up to two consultants to conduct CIA |
| Core Course / Delivery Development | TBA | TBA | Pending recommendations and approval |
| Delivery of Pilot (CSIA) – CEO William Malek to deliver all pilots | $18,000 + travel | 20% | May require up to two consultants to deliver Pilot |
| Further Core Course / Delivery Development | TBA | TBA | Pending recommendations and approval |

\* Total costs hereunder is *inclusive* of all standard SAPM course materials (3 ring binder, 200-225 pgs, black & white), which also includes shipping and handling. Printing and fulfillment options are TBD.

**Bank of America**

### 4.    Breakdown of Total Costs (including Travel & Expenses) Continued:

| Service | Price | Percentage Discount | Comments |
|---|---|---|---|
| 2004 Core Course Delivery (CSIA, MIP and MPP) | | | |
| Up to 25 courses per annum | $20,500 + travel | 10% | Up to 15 participants. 16-20 participants at $750 each, 21-24 participants at $600 each. Travel for one Instructor. |
| Up to 50 courses per annum | $18,000 + travel | 20% | Up to 15 participants. 16-20 participants at $750 each, 21-24 participants at $600 each. Travel for one Instructor |
| Up to 75 courses per annum | $15,750 + travel | 30% | Up to 15 participants. 16-20 participants at $750 each, 21-24 participants at $600 each. Travel for one Instructor |
| 100+ courses per annum | $13,500 + travel | 40% | Up to 15 participants. 16-20 participants at $750 each, 21-24 participants at $600 each. Travel for one Instructor |

### 5.    Project Schedule/Deliverable Schedule/Milestone Payments:

| Milestone # | Deliverables | Milestone Payment |
|---|---|---|
| #1 | Signed Contract by November 17th, 2003 | N/A |
| | | |
| #2 | Deliver Pilot (CSIA) on December 4th and 5th, 2003 in Jacksonville, FL | $18,000 for up to 24 participants plus travel due net 30 of completion of Milestone #2s |
| #3 | Approved recommendations and costs for customization of course material and/or delivery instructions of core courses (CSIA, MIP and MPP) by January 30, 2004 | TBA pending approval of Milestone #3 |
| #4 | Sign-off of incorporation of approved customization of course material and/or delivery instructions of core courses (CSIA, MIP and MPP) by: TBA | TBA pending approval of Milestone #3 |
| | | |

### 6.    Acceptance Criteria for Deliverables:
All Deliverables above shall be subject to acceptance by BATO as determined in its sole discretion. Acceptance by BATO must be in writing to be effective (email may constitute an adequate writing).

### 7.    Project Management/Project Communication:

Vivien Scofield, Managing Partner, IPS          650-578-6300 (Office)
                                                650-980-7877 (Cell)

Barba Kandarian, Sales Manager, IPS            650-578-6300 (Office)



**Bank of America**

Chris Davis, Client Professional Services Associate, IPS    650-578-6300 (Office)

John Warren, VP Strategic Business Solutions, IPS    208-853-5563 (Office)
                                                      208-841-0310 (Cell)

William Malek, CEO, IPS    406-586-5077 (Office)
                           406-570-8436 (Cell)

8.    **BATO Invoice Address:**
      Patty Smith
      FL9-100-09-14
      Bank of America Office Park
      9000 Southside Blvd., Bldg. 100
      Jacksonville, FL 32256-0793

      Vivian Scofield
      IPSolutions, Inc
      160 Bovet Road
      Suite 400
      San Mateo, CA
      94402

**Travel & Expenses:**
Any travel and living expense expressly requested by BATO of Consultant must be pre-approved by BATO prior to Consultant incurring said expenses and shall be itemized on the monthly invoices submitted to BATO. Furthermore, Consultant shall book all airline travel through BATO's preferred travel agent, Rosenbluth/American Express, by calling Ralene Nelson at (707) 374-5903.

**Other IPS terms and conditions to be incorporated in appropriate section of agreement**
- All prices are in U.S. dollars and are exclusive of travel and any VAT/GST or federal, state, or local taxes.
- Payment terms are net 30 days from date of invoice, or date of delivery, whichever is later
- A 50% charge will be assessed if engagement(s) is cancelled within 21 days of the scheduled start date. A 25% charge will be assessed if engagement(s) are changed within 21 days of the scheduled start date. If a cancellation is received 14 days or less of the engagement start date, a 100% charge will be assessed. If a change is received 14 days or less of the engagement start date, a 25% charge will be assessed.
- Prices are FOB point of destination
- Client is responsible for providing the facilities and all equipment needed for engagements and consultants while on site
- The quoted engagement prices do not include travel and living expenses, which will be billed at actual cost
- **Minimum viable attendance to achieve SAPM certification:** If a Bank of America participant misses more than 120 minutes of an on-site SAPM course, the participant will not receive their Stanford Advanced Project Manager certification. With the approval of the Stanford Center for Professional Development, the participant will be offered the opportunity to make-up the missed time online at no additional cost.

# EXHIBIT 2

# AGREEMENT ADDENDUM
4.0 Curriculm Design Document

**Bank of America**

| | | | |
|---|---|---|---|
| **Supplier Name:** | IP Solutions, Inc. | **Agreement Number:** | 25048-001-001 |
| **Supplier Address:** | 160 Bovet Road. Suite 400, San Mateo, CA 94402 | **Statement of Work #:** | 2 |
| **Supplier Telephone:** | 650-578-6300 | **Effective Date:** | 3-8-2005 |

This Addendum to the subject Agreement is by and between Supplier and Bank of America, N.A. ("BANA"). Each capitalized term used but not defined herein shall have the meaning assigned in the Agreement.  The rights of BANA set forth in this Addendum shall inure to BANA's and its Affiliates.

BANA and Supplier agree as follows:

1.    As of April 1, 2004, FleetBoston Financial Corporation merged with and into Bank of America Corporation, with Bank of America Corporation as the surviving corporation.

2.    Bank of America, N.A. ("BANA") has assumed any and all of Bank of America Technology and Operations ("BATO") obligations under the Master Agreement 25048-001-001.

3.    Add Statement of Work #2 attached hereto.

The terms and conditions of the Agreement, except as duly modified by this and previous Addendums. if any, remain in full force and effect.

| IP Solutions, Inc. ("Supplier") | Bank of America, N.A. ("BANA") |
|---|---|
| By: _____ | By: _____ |
| Name: _____Thomas Biniek_____ | Name: _____Anh Hoang_____ |
| Title: _____CFO_____ | Title: _____AVP-Sourcing Lead_____ |
| Date:_____3-8-2005_____ | Date:_____3-8-2005_____ |

## SCHEDULE A-1: STATEMENT OF WORK #2
### (incorporated by reference into Agreement # 25048-001-001)

1.    **PROJECT OVERVIEW:**  4.0 Curriculm Design Document

2.    **DELIVERABLES:**

Gather requirements for 4.0 Education Courses
-    Project Management Foundations
-    Detailed Course
-    Overview Course

Develop 4.0 Education Design Document

3.    **TOTAL COST BREAKDOWN:  Pricing hereunder shall be a "not to exceed" bid price.**

| Cost Category | Daily Rate | # Days | Total |
|---|---|---|---|
| Instructional Designer/ | | | |
| Project Manager | $2,500 | 10 | $25,000 + Travel Exp |
| | | | |

4.    **PROJECT SCHEDULE:**

| Milestone Number | Timeframe | Deliverable(s) | Responsible Party (e.g. Supplier, BANA, Joint) | Milestone Payment (to be invoiced upon acceptance of associated milestone) |
|---|---|---|---|---|
| 1 | April 18, 2005 | Requirements for 4.0 Education Courses: <br>○    Project Management Foundations <br>○    Detailed Course <br>○    Overview Course | Supplier | This first phase and first set of deliverables related to scoping the project will be billed in a lump sum upon completion.  No more than $25,000 + travel. |
| 2 | | 4.0 Education Design Document | Supplier | |
| 3 | | Sign-off on 4.0 Education Design Document | BANA | |

5.    **ACCEPTANCE OF DELIVERABLES:** All Deliverables set forth above shall be subject to acceptance by BANA as determined in its sole discretion. If BANA determines that one or ore Deliverables fail to conform to this SOW (or to the description provided in any other document incorporated by reference herein), BANA may withhold the corresponding Milestone Payment(s). BANA and Supplier may agree to a mutually acceptable plan for correcting the non-conforming Deliverable(s).

6.    **PROJECT CONTACTS:**

*Bank of America Confidential*                                    2

| Supplier Contact | BANA Contact |
|---|---|
| Ellen Maxwell<br>IPSolutions, Inc<br>160 Bovet Road, Suite 400<br>San Mateo, CA 94402<br>650-931-2750 | Jennifer Hamood<br>Jennifer.Hammond@bankofamerica.com<br>704-388-9048 |

7.    **BANA INVOICE ADDRESS:**

| Send invoices to    - |
|---|
| Same as above |

8.    **PRINTING & FULFILLMENT OF COURSE MATERIALS/DOCUMENTATION:** The development and delivery of the following course materials and documentation are included within the scope and pricing set forth above (e.g. instructor's manual, participant's manual, PowerPoint deck. overhead projector transparencies)(note which party will be responsible for printing & fulfillment and whether this is an additional cost or already included)

9.    **TOOLS USED FOR PROJECT:**

Supplier represents and warrants that no proprietary tools or programming languages will be used to develop the Course and that only industry-standard tools will be used for Course development. Supplier shall use the following authoring tools, development tools, and/or programming languages to develop the course hereunder (e.g. Dreamweaver, Flash, Lectora, etc.):

10.    **TRAVEL & EXPENSES:** Any travel and living expense expressly requested by BANA of Supplier must be pre-approved by BANA prior to Supplier incurring said expenses and shall be itemized on the monthly invoices submitted to BANA. Furthermore, Supplier shall book all travel arrangements through BANA's third party travel agent, Rosenbluth Travel. The primary BANA contact will work with Rosenbluth to set up a Supplier profile enabling Supplier to book travel online or by calling a toll free number. Supplier shall not charge BANA for travel time.

*Bank of America Confidential*                3

# EXHIBIT 3

# AGREEMENT ADDENDUM

**Bank of America**

| | | | |
|---|---|---|---|
| **Supplier Name:** | IP Solutions, Inc. | **Agreement Number:** | 25048-001-001 |
| **Supplier Address:** | 160 Bovet Road, Suite 400, San Mateo, CA 94402 | **Statement of Work #:** | 3 |
| **Supplier Telephone:** | 650-578-6300 | **Effective Date:** | 3-8-2005 |

This Addendum to the subject Agreement is by and between Supplier and Bank of America, N.A. ("BANA"). Each capitalized term used but not defined herein shall have the meaning assigned in the Agreement. The rights of BANA set forth in this Addendum shall inure to BANA's and its Affiliates.

BANA and Supplier agree as follows:

    1.      Add Statement of Work #3 attached hereto.

The terms and conditions of the Agreement, except as duly modified by this and previous Addendums, if any, remain in full force and effect.

| IP Solutions, Inc. ("Supplier") | Bank of America, N.A. ("BANA") |
|---|---|
| By: _William Malek_ | By: _____ |
| Name: WILLIAM MALEK ~~Thomas Biniek~~ | Name: Anh Hoang |
| Title: ~~CEO~~ CEO | Title: AVP-Sourcing Lead |
| Date: 3-26-05 | Date: 3 21 |

**SCHEDULE A-1:** STATEMENT OF WORK #3

Outlined below is Statement of Work #3 (SOW #3) which is attached to and incorporated by reference into Agreement # 25048-001-001.

1.    **Deliverables:**  see #3 below

2.    **Breakdown of Total Costs (excluding Travel & Expenses):**  see # below

3.    **Project Schedule/Deliverable Schedule/Milestone Payments:**

| Milestone Dates | Deliverables | Fees-to be invoices upon acceptance of deliverable |
|---|---|---|
| (3/21 – 4/1) | Development and Customization of : <br> -    Participant Guide <br> -    Instructor Guide <br> -    Quick Reference Card <br> -    Wall Charts <br> -    Gantt Chart | *See Effort |
| (4/4 – 4/5) | Pilot <br> -    Two day Delivery | $16,000 |
| (4/6 – 4/8) | Train-The-Trainer <br> -    Two and Half day Delivery  (2 IPS Instructors due to condensed timeframe) | $25,000 per 4 Instructors |
| (4/11 – 15) | Further Customization of materials based on Pilot and Train–The-Trainer | *See Effort |
| Effort | Estimated 15 days @ $2,500 per day | *$37,500 |
| Estimated Total for Deliverables | Assuming 4 Instructors for TTT. Price will increase by $25,000 per additional 4 Instructors. | $78,500 |
| Rights to PMM Intellectual Property | All materials will be produced and shipped by IPS | $450 per participant |

|  | D2: Practical Application | Cost |
|---|---|---|
| Deliverables (3/21 – 4/1) (4/11 – 4/29)* | Development and Customization of : <br> - Participant Guide <br> - Instructor Guide <br> - Other deliverables to be determined | *See Effort |
| (5/2 – 5/13TBA) | Pilot <br> - Three day Delivery <br> - | $18,000 |
| 5/2 – 5/13TBA) | Train-The-Trainer <br> - Two and Half day Delivery (2 IPS Instructors due to condensed timeframe) | $25,000 per 4 Instructors |
| (5/16 – 5/20TBA) | Further Customization of materials based on Pilot and Train–The-Trainer | *See Effort |
| Effort | Estimated 40 days @ $2,500 per day <br> *Two IPS resources 4/11 – 4/29 | *$100,000 |
|  |  |  |
| Estimated Total for Deliverables | Assuming 4 Instructors for TTT. Price will increase by $25,000 per additional 4 Instructors. | $143,000 |
|  |  |  |
| Rights to Intellectual Property | Not Applicable. IP owned by Bank of America. |  |

Prices do not include travel and expenses associated with IPS Consultant

6.    Acceptance of Deliverables: Payment for all deliverables and milestones set forth above shall be subject to acceptance by BANA. Acceptance by BANA must be in writing to be effective (email may constitute an adequate writing).


7.    Project Contacts:

Jennifer Hamood
Bank of America
Jennifer.Hamood@bankofamerica.com
704-388-9048

8.    BANA Invoice Address:  same as above

9.    Performance Measurements: n/a

10.    Tools Required for Project:

Consultant will use the following licensed software, patents, and trade secrets that BANA will not provide: n/a

**Travel & Expenses:**
Any travel and living expense expressly requested by BANA of Consultant must be pre-approved by BANA prior to Consultant incurring said expenses and shall be itemized on the monthly invoices submitted to BANA.  Furthermore, Consultant shall book all airline travel through BANA Travel Department.